# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs April 17, 2013

## STATE OF TENNESSEE v. KIMAR RASHAD PEEBLES

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2010-C-2040    Cheryl Blackburn, Judge**

---

**No. M2012-00942-CCA-R3-CD - Filed May 22, 2013**

---

A Davidson County jury convicted the Defendant, Kimar Rashad Peebles, of aggravated robbery, and the trial court sentenced him to ten years in the Tennessee Department of Correction. On appeal, the Defendant contends: (1) the evidence is insufficient to sustain his conviction; and (2) the trial court erred when sentencing him. After a thorough review of the record and applicable authorities, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Brian T. Boyd, Brentwood, Tennessee, for the Appellant, Kimar Rashad Peoples.

Robert E. Cooper, Jr., Attorney General and Reporter; Jennifer L. Smith, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Jeff Burks, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts
### A. Trial

This case arises from the robbery of Julie McSweeney, which occurred on May 12, 2010. A Davidson county grand jury charged the Defendant with committing this offense. At the Defendant's trial on this charge, the parties presented the following evidence: Julie McSweeney, the victim, testified that on May 12, 2010, she was in downtown Nashville. She recalled that much of Nashville was flooded at the time, and McSweeney was attempting to run several errands, including going to the bank and paying her Cricket phone bill.

McSweeney testified she had recently received a check for $1,000 from her grandmother's estate. She said she cashed the check and planned to pay her cellular phone bill with a portion of that money.

McSweeney said, as she was running errands, she saw a Cricket store near the freeway on Lafayette Street, near downtown. She had never before been in this store, but she entered the store to pay her bill. When she entered, she saw two men working and two additional male customers standing at the counter, one of whom was the Defendant. McSweeney spoke with one of the salesmen, and she payed her bill, leaving her with close to $1,000 remaining in cash.

McSweeney recalled that, while she was in the store, the Defendant kept "getting near" her. She described the Defendant as fidgety and said he was "kind of moving around a lot and talking." The Defendant asked her if she wanted to buy a phone that he had on the counter. The Defendant appeared to know one of the salesmen, in that the two spoke in a familiar way. McSweeney said the Defendant left the store before she did. McSweeney left the store after paying her bill.

McSweeney testified that, after she left the store, the Defendant was standing in front of her. He was "talking pretty rapidly," and he said to her, "give me your wallet, give me your wallet." McSweeney, who was shocked, looked down and noticed that the Defendant had "something under his shirt . . . that was pointed at [her]." McSweeney said she complied with his request and handed him her wallet and cell phone. The Defendant told McSweeney to "get in the car," and he pointed toward an area where her truck and his truck were both parked. McSweeney said she had no intention of getting into a car with him and paused. The Defendant asked her if she wanted to get shot and became angry that she was not getting in the car. She said she did not verbally respond and instead "very calmly" backed up a few steps and then turned around and went back into the store.

McSweeney testified that, when she entered the store, she told the salesmen what had happened. The two men went outside, and McSweeney looked out the store window and saw the Defendant speed away from the store in a truck. The salesmen returned to the store and called the police, who arrived at the scene. McSweeney described to the police officers what had happened. She said she had never recovered the money the Defendant took from her.

During cross-examination, McSweeney testified that at the time she handed the Defendant her wallet, she dropped her purse on the ground. She conceded that she never saw a gun, but she assumed the Defendant had one from the circumstances. She maintained that there was "some sort of object that he was pointing towards [her] under his shirt."

Amin Shabazz testified that he was working at the Cricket store as the store manager at the time of this incident. Shabazz recalled that McSweeney came into the store on May 12, 2010, before lunch to pay her cellular phone bill. He recalled that the Defendant was also in the store. Shabazz was familiar with the Defendant because he remembered the Defendant and the Defendant's parents from their frequenting the Cricket store. He recalled that the Defendant was "bugging" McSweeney. Shabazz told the Defendant to leave McSweeney alone, and the Defendant left the store. Shortly thereafter, McSweeney left the store only to return a short time later. Shabazz recalled that, from his vantage point inside the store, he saw McSweeney walk toward her Range Rover. He saw the Defendant lean into his brown Chevrolet truck, get something, and conceal it under his shirt. Shabazz said he anticipated that a robbery was about to occur.

Shabazz said he next saw McSweeney returning to the store, and he wondered what was wrong with her. When she entered the store, he noted that she was crying and had her hands up. Shabazz went outside and saw the Defendant pick up McSweeney's purse. He asked the Defendant what he was doing, what was wrong with him, and if he was crazy. The Defendant got into his car and sped away.

Shabazz said police officers came to the store, and he gave them the names of the Defendant's parents. He also gave the police officers the Defendant's itemized cellular phone bill and provided officers with video from the store's video surveillance, which had recorded this incident. The State played this video for the jury.

During cross-examination, Shabazz agreed the video did not show the Defendant concealing something under his shirt, but Shabazz said that the door of the Defendant's truck blocked the camera's view. Shabazz said he never saw the Defendant with a weapon.

Michael Johnson, a Metropolitan Nashville police officer, testified that he responded to this robbery call to police. Officer Johnson said that after he received statements from McSweeney and Shabazz, he requested a detective, Detective William Stewart, to investigate the case. Detective Stewart arrived and took over the investigation. During cross-examination, Officer Johnson said he did not find a weapon at the scene.

Detective William Stewart testified he responded to this call at Officer Johnson's request for a detective. He said Shabazz offered a lot of information, including names and a print-out of an account that the robber had paid money toward. Shabazz told the detective that the Defendant's mother's name was "Ya-Ya" or "La-La" and that she worked at the Mercury Court Hotel.

The detective went to the hotel and spoke to the owners, who said their employee's

name was "Ya-Ya." The detective spoke with "Ya-Ya" on the phone. Detective Stewart told "Ya-Ya" that he was looking for her son, Kenny. "Ya-Ya" told him she did not have a son named Kenny, but she had a son named Kimar. She explained that he had just called her and told her that he was present when a robbery occurred. "Ya-Ya" went on to state that Kimar told her that he witnessed the robbery and that a man named "Mike" was the man who had committed the robbery. "Ya-Ya" gave the detective her son's cellular phone number.

Detective Stewart testified that he called Kimar, whom he later identified as the Defendant, and the Defendant maintained that he was present when another man robbed someone. The Defendant said he would come to the police station and talk with the detective, but he never came. The detective learned that the Defendant's last name was Peebles. The detective said he created a photographic lineup that included the Defendant's photograph, and Shabazz identified the Defendant's picture as belonging to the man who committed the robbery. The detective said that as part of his investigation he also obtained the video surveillance from the store.

During cross-examination, Detective Stewart testified that the video did not show a weapon and that he found no weapon at the crime scene.

Craig Bega, a Metropolitan Nashville Police Department officer, testified that he executed the arrest warrant for the Defendant on May 24, 2010. During cross-examination, Officer Bega said he did not find any weapons on the Defendant when he arrested him.

The Defendant testified that he went to the Cricket store to pay his bill. Shortly thereafter, McSweeney came into the store. The Defendant said he left and went to the truck he was driving. He got his keys out of his pocket, started the truck, and shut the back door. He said he pulled up his pants and saw McSweeney walking out of the store. He said he approached her and asked her to drop her purse. She complied, and the Defendant picked up the purse and walked back to his truck and pulled out of the parking lot. The Defendant explained that he held onto his pants throughout his interaction with McSweeney because they were sagging, and he did not want them to fall down while he was running away after taking McSweeney's purse. The Defendant said he did not have a weapon with him, and he never acted like he had a weapon with him. The Defendant further denied ever asking McSweeney if she wanted to get shot or asking her to get into a vehicle.

Based upon this evidence, the jury convicted the Defendant of aggravated robbery.

## B. Sentencing Hearing

At the sentencing hearing, the trial court noted that the Defendant's sentencing range

was between eight and twelve years, service of which was mandatory. The State offered a summary of the Defendant's juvenile file and also the presentence report, both of which the trial court admitted as exhibits.

The Defendant then testified and said he took full responsibility for his actions. He acknowledged his many mistakes. He said he was a changed man and asked for the trial court's sympathy.

During cross-examination, the Defendant agreed he was first arrested when he was fourteen or fifteen years old. He said he had violated the terms of his probation in juvenile court on multiple occasions. He was also "found delinquent" in juvenile court for possessing a handgun. The Defendant said he did not have any adult felony convictions but said that, as an adult, he had received multiple handgun possession charges. The Defendant said he had been cited for possessing a prohibited weapon on March 20, 2010, just two months before the robbery. He pled guilty to the charge in July 2010, after the robbery.

The Defendant said that, at the time of the robbery, he was living with his mother, but he did not know the address of the home where they lived. He conceded that he took the money from McSweeney and said he spent it on food and diapers for his children. He said he had three children with "several" women. All of his children lived with their respective mothers. The Defendant agreed he had four cellular phones with him at the Cricket store. He said his sister had given three of them to him, telling him that they were old. He said he paid the bill on only one phone while he was at the store.

Based upon this evidence, the trial court applied enhancement factor (1), finding that the Defendant had a previous history of criminal convictions in addition to those necessary to establish the appropriate range. *See* T.C.A. § 40-35-114 (1) (2010). The trial court noted the Defendant's five prior misdemeanor convictions and also stated that it was not considering the Defendant's juvenile convictions because they would not be felonies if he were convicted as an adult. The trial court also applied enhancement factor (8), that the Defendant failed to comply with conditions of a sentence involving release into the community, noting that the record indicated that he had violated his probation. T.C.A. § 40-35-114(8). The trial court also applied mitigating factor (7), based upon the Defendant's statements that he used the money he took to purchase diapers for his children, but the court stated that mitigating factor (7) was not "very persuasive." T.C.A. § 40-35-113(7) (2010). The trial court then sentenced the Defendant, a Range I offender, to ten years of incarceration.

It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends: (1) the evidence is insufficient to sustain his conviction; and (2) the trial court failed to apply an applicable mitigating factor during sentencing.

## A. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to sustain his conviction for aggravated robbery because the State did not prove that he possessed a weapon or caused McSweeney to fear that he had a weapon during the commission of the robbery. The State counters that the proof is sufficient to sustain the Defendant's conviction.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

To support Defendant's conviction for aggravated robbery, the State was required to prove that Defendant committed the intentional or knowing theft of property from the person of another using violence or fear and accomplished with a deadly weapon or an article used to lead a victim to reasonably believe it to be a deadly weapon. *See* T.C.A. §§ 39-13-401(a), -402(a). The only element of this crime in dispute is whether the Defendant possessed a weapon or an article used to lead the victim to reasonably believe it to be a weapon.

The evidence, viewed in the light most favorable to the State, proved that the Defendant first encountered McSweeney in the Cricket store. He left the store before she did and, after she left the store, Shabazz saw the Defendant reach into his car and then place something under his shirt, which Shabazz believed might be a weapon. The Defendant approached the victim with his left hand under his shirt and demanded that she give him her wallet. It appeared to the victim that the Defendant was pointing something through his shirt toward her, and she assumed it was a weapon. When McSweeney did not immediately respond to the Defendant's demands, he asked her if she wanted to get shot. The victim dropped her purse and slowly backed away from the Defendant and returned to the store. The Defendant took McSweeney's wallet, got into his truck, and left the parking lot.

As the State points out, this Court has affirmed several aggravated robbery convictions where a defendant did not display a weapon but kept his hand in his pocket throughout the incident. In *State v. Monoleto D. Green*, No. M2003-02775-CCA-R3-CD, 20005 WL 1046800, (Tenn. Crim. App., at Nashville, May 5, 2005), *no Tenn. R. App. P. 11 application filed*, this Court discussed in depth the law applicable to an aggravated robbery wherein the

defendant kept in hand in his pocket. The Court stated:

> This Court has previously ruled that an actual weapon need not be displayed in order to meet the requirements of the aggravated robbery statute. *See State v. Davenport*, 973 S.W.2d 283, 286 (Tenn. Crim. App. 1998) (holding that the evidence was sufficient to support aggravated robbery where the defendant fashioned a rag over his empty hand to lead the store clerk to believe he held a weapon). Additionally, this Court has issued several opinions specifically addressing the "hand in the pocket" aggravated robbery scenario from which it may draw guidance. While this Court expressed in dicta some "reservations" in *State v. Jemison*, the clear holding of the case was that "[t]he jury was entitled to accredit the defendant's threat and to infer from it and his hand positioning that he was armed." [*State v. Daryl Jemison*, No. 01C01-9303-CR-00107, 1994 WL 108944 (Tenn. Crim. App., Nashville, Mar. 31, 1994)].

The Court went on to note that in *State v. Aaron Cooper*, No. 01C01-9708-CR-00368, 1998 WL 668263, at *2 (Tenn. Crim. App., Nashville, Sept. 30, 1998), the Court stated that the language of our current aggravated robbery statute was "intended . . . to include robbery committed under the pretense of being armed," and already included a safeguard or "restriction" by requiring that the victim " reasonably believe it to be a deadly weapon." *Id.*

In accordance with the foregoing authorities, we conclude that the victim in this case, McSweeney, reasonably believed that the Defendant had a weapon. The Defendant had something under his shirt that appeared to be a weapon pointed at her. When she hesitated following his commands, he asked her if she wanted to get shot. After she dropped her purse, the victim slowly backed away from the Defendant, thinking he was still pointing a gun at her. Shabazz, a witness, also thought the Defendant had placed a weapon under his shirt. While the Defendant claims that he was merely holding his pants so that they would not fall down when he fled the robbery, we conclude that the victim reasonably thought he possessed a weapon. Accordingly, we conclude that the evidence sufficiently supports his conviction, and he is not entitled to relief on this issue.

### B. Sentencing

The Defendant contends that the trial court erred when it sentenced him because it should have applied mitigating factor (13), the catchall provision, because no weapon was used in the commission of the crime and because he took responsibility for his actions and was remorseful. The State counters that the trial court properly rejected this mitigating factor. It further states that, even if the additional mitigating circumstance was supported by the

record, a trial court's misapplication of an enhancement or mitigating factor (or the rejection of such factor) is no longer grounds to invalidate a sentence, unless the trial court wholly departed from the Sentencing Act, citing *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012).

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2010); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). In 2005, the Tennessee General Assembly amended the sentencing law in order to bring Tennessee's sentencing scheme into compliance with United States Supreme Court rulings on the subject. *See United States v. Booker*, 543 U.S. 220 (2005); *Blakely v. Washington*, 542 U.S. 296 (2004).

Before the 2005 amendments to the Sentencing Act, both the State and a defendant could appeal the manner in which a trial court weighed enhancement and mitigating factors applied to the defendant's sentence. T.C.A. § 40-35-401(b)(2) (2004). The 2005 amendments, however, deleted, as grounds for appeal, a claim that the trial court did not properly weigh the enhancement and mitigating factors. *See* 2005 Tenn. Pub. Acts ch. 353, §§ 8, 9. As a result, the appellate courts were "left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." *Carter*, 254 S.W.3d at 345-46.

Appellate review of sentences has been *de novo* with a presumption of correctness. *See* T.C.A. § 40-35-401(d) (2010). In a recent decision, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *Id.* at 708; *State v. Christine Caudle*, 338 S.W.3d 273, 278-79 (Tenn. 2012) (explicitly applying the same standard to questions related to probation or any other alternative sentence).

A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980).

The "presumption of reasonableness" applied to sentences imposed by trial courts "'reflects the fact that, by the time an appeals court is considering a within-Guidelines sentence on review, *both* the sentencing judge and the Sentencing Commission will have reached the *same* conclusion as to the proper sentence in the particular case.'" *Bise*, 380 S.W.3d at 703 (quoting *Rita v. United States*, 551 U.S. 338, 341 (2007) and discussing Federal sentencing guidelines). A presumption of reasonableness "simply recognizes the real-world circumstance that when the judge's discretionary decision accords with the [Sentencing] Commission's view of the appropriate application of [sentencing purposes] in the mine run of cases, it is probable that the sentence is reasonable." *Rita*, 551 U.S. at 350-51 (discussing Federal sentencing guidelines).

In conducting its review, this Court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* T.C.A. §§ 40-35-102, -103, -210 (2010); *see also Bise*, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. *See* T.C.A. § 40-35-401, Sentencing Comm'n Cmts.

We conclude that the trial court imposed a within-range sentence based upon application of two enhancement factors and one mitigating factor and after consideration of the purposes and principles of sentencing. The trial court conducted a thorough review of the Defendant's case and circumstances guided by the relevant legal principles. Accordingly, the trial court did not abuse its discretion when it sentenced the Defendant to ten years for his aggravated robbery conviction. The Defendant is not entitled to relief.

## II. Conclusion

After a thorough review of the record and the applicable law, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE